**UNITED STATES of America,**
**Appellant,**

v.

**CONTINENTAL OIL COMPANY,**
**Appellee.**

**No. 8223.**

United States Court of Appeals
Tenth Circuit.

July 18, 1966.

Robert V. Zener, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., B. Andrew Potter, U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, on the brief), for appellant.

Granville Tomerlin, Oklahoma City, Okl. (L. David Trapnell, Ponca City, Okl., Tomerlin & High, Oklahoma City, Okl., Roy C. Hackley, Jr., New York, N. Y., and Joseph C. Kotarski, Ponca City, Okl., of counsel, on the brief), for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and PICKETT, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

The primary question presented in this action is the construction of a provision in a quitclaim deed from the Reconstruction Finance Corporation,[1] an agency of the United States, to Continental Oil Company,[2] reading as follows:

"Grantee covenants and agrees that in the event Grantee uses the facilities of the said Plancor 882 for extracting toluene from hydroformate within a period of eight (8) years from and after June 1, 1948, Grantee shall and will pay an additional sum of Two Thousand Six Hundred Sixty-five Dollars ($2,665.00) per month for each month or part thereof that the facilities are used for that purpose, until the end of a period of eight (8) years from and after June 1, 1948."

Specifically, it involves the determination of the meaning of the phrase "for extracting toluene from hydroformate." Certain background will aid in arriving

---

1. Hereinafter referred to as RFC.

2. Hereinafter referred to as Continental.

at the answer to that question. In the latter part of 1941, and immediately prior to its entry into World War II, the United States was engaged in a rearmament program, including the establishment of additional productive capacity for "nitration grade toluene," a product used in the manufacture of TNT and also a component of aviation gasoline. Defense Plant Corporation,[3] a subsidiary of RFC, was authorized to assist the rearmament program by acquiring or constructing production facilities and leasing such facilities to qualified operators.

Shortly after April 27, 1942, Continental conveyed a 4.78-acre tract of land, located near its petroleum refining and processing facilities at Ponca City, Oklahoma, to DPC. In the latter part of 1940, Continental had installed as one of its refinery units at Ponca City a hydroformer designed, when operated under a process patent owned by M. W. Kellogg Company, to convert certain portions of naphthalenic feedstocks derived from other refinery operations into a complex chemical mixture known as "hydroformate," containing various percentages of aromatics, such as toluene, benzine and xylene. DPC caused to be constructed on such tract of land a plant known as Plancor 882, by which toluene of 99 per cent purity could be extracted from hydroformate, a feedstock, under a process patent owned by Shell Development Company. It was originally contemplated that such toluene should be used in the manufacture of TNT.

On April 27, 1942, DPC, as lessor, entered into a written lease with Continental, as lessee, by which DPC leased for a stipulated rental Plancor 882 to Continental, to be operated by Continental when completed for the extraction from hydroformate of toluene for the United States.

On May 6, 1942, the United States and Continental entered into a supply contract, under which Continental agreed to furnish to the United States not less than 2,000,000 or more than 2,500,000 gallons of nitration grade toluene at a unit price of 28¼ cents per gallon, in strict accordance with specifications and drawings which required the toluene to be not less than 99 per cent pure.

On May 1, 1942, the Defense Supplies Corporation,[4] a Government agency, and Continental entered into a contract whereby the latter undertook to sell and DSC agreed to purchase the output of aviation gasoline from that part of Continental's Ponca City refinery known as Plancor 1042. The Government specification for aviation gasoline at that time and up to the time the quitclaim deed referred to above was executed and delivered required that it should contain toluene of 98 per cent or greater purity. At the time of the delivery of the quitclaim deed, toluene of less than 96 per cent purity had never been used as a component of aviation gasoline.

During the period Plancor 882 was under construction, the United States decided that the production of toluene therefrom should be used as a component of aviation gasoline, rather than for the manufacture of TNT.

The construction of Plancor 882 was completed in September, 1943. During the first few months Plancor 882 was operated, the toluene produced therefrom was of 99 per cent purity. Thereafter, until operation of the plant was closed down, following the termination of World War II in August, 1945, the toluene produced therefrom was of 98 per cent purity.

Upon the termination of World War II, Plancor 882 was no longer needed and it lay idle until November of 1946. From the latter date until the sale thereof to Continental, referred to hereinafter, two of its distilling towers, being only a part of the device, were operated by Continental, under a lease from the United States, for distillation purposes.

In 1947, the United States decided to sell Plancor 882 and on September 4,

3. Hereinafter referred to as DPC.

4. Hereinafter referred to as DSC.

1947, the War Assets Administration[5] invited bids therefor.

Continental obtained two estimates of the salvage value of Plancor 882. It took the average thereof, which was $77,000, added one-third of that amount thereto and an amount for value of the land, being the amount Continental received from the United States therefor, and thus arrived at a round figure of $104,000 and submitted a bid in that amount. At the time of the submission of such offer, Continental contemplated moving Plancor 882, in the event it acquired the same, to another location and using it for other purposes than the extraction of toluene.

WAA believed the plant might still be used for toluene extraction and on December 31, 1947, made a counteroffer of $264,000. Such counteroffer also stipulated that the following provision should be included in the deed of conveyance:

"Should Continental Oil Company use any part of this plant on-site for the production or extraction of any quantity of toluene whatsoever within 8 years from the date of acceptance of the Letter of Intent, Continental Oil Company shall so notify this Administration or its assignee of such use and shall pay to War Assets Administration or its assignee the additional sum of $1,728 per calendar month for the use thereof. Such sum to be in addition to any other monies paid for the purchase of said property."

On March 24, 1948, Continental submitted a new offer of $127,289 and proposed the incorporation in the deed of a provision reading as follows:

"Should the facilities be used for extracting toluene from hydroformate within 8 years from the date of letter of intent to purchase Plancor 882, to pay an additional $1,728 a month for each month or part thereof that the facilities are used for this purpose or until eight years have elapsed."

On May 14, 1948, Continental increased its cash offer to $175,000 and again proposed the incorporation in the deed of the provision set out in the preceding paragraph, except that the stipulated rent was increased to $2,665 per month.

That offer was accepted and WAA conveyed Plancor 882 to Continental by a quitclaim deed, which contained the covenant of the grantee set forth above in the first paragraph of this opinion.

The Korean War created a new need for aviation gasoline. To meet this need, Continental again operated Plancor 882 for the extraction of toluene of 98 per cent or greater purity. That operation continued from November, 1950, until August, 1952, and during that period Continental paid the United States the monthly rental provided for in the deed.

In 1952, Continental gave consideration to lowering of the purity of the toluene produced by Plancor 882 for use in aviation gasoline. Such lowering became feasible because of a change in the Government specifications for aviation gasoline issued during the Korean War. Aviation gasoline is a blend of toluene and other components. As indicated before, during World War II the Government specifications for such gasoline were addressed to the quality of toluene compounded therein and required aviation gasoline toluene to be of 98 per cent or greater purity. However, during the Korean War the specifications were addressed only to the quality of the end product, aviation gasoline. Continental discovered that it was possible to produce a quality of aviation gasoline, which would fully meet the Government specifications therefor, by blending toluene of less than 85 per cent purity and greater than 80 per cent purity, with other components of a higher quality than was formerly used.

Continental's license agreement from Shell Development Company to use the latter's patented process in the operation of Plancor 882 required Continental to pay royalties only when the product produced was toluene in excess of 85 per

---

5. Hereinafter referred to as WAA.

cent purity. The feedstock for the production of such lower purity toluene was known as "platformate." Continental called it "ABC." Such feedstock was produced from a device known as a "platformer," designed and operated by Continental in accordance with a Universal Oil Products' patent and technology under license from Universal Oil Products. The cost of such feedstock was less than the cost of hydroformate; the cost of producing the lower purity toluene through extraction by Plancor 882 was less than the cost of producing toluene of 98 per cent or greater purity, and when Continental used its platformer to produce ABC and Plancor 882 to extract such lower purity toluene therefrom, it was not required to pay royalties to the M. W. Kellogg Company or to Shell Development Company.

In contracts entered into between the United States and Continental prior to the execution and delivery of the deed and prepared by the agencies of the United States, the term "toluene," not otherwise defined therein, was used, as shown by later contracts between the United States and Continental, to denote specification grade toluene. The lease agreement of April 27, 1942, used the word "toluene" and did not otherwise define it, but the supply contract of May 26, 1942, clearly shows that the term in the lease meant nitration grade toluene. Likewise, the amended lease agreement of May 23, 1944, in the provisions with respect to aviation gasoline, used the word "toluene" and did not otherwise define it, but the tentative and permanent specifications of the United States for PAW aviation gasoline, issued on August 31, 1943, and January 4, 1944, respectively, show it was used to denote industrial grade toluene of not less than 98 per cent purity.

The original purpose of Plancor 882 and its usage prior to the end of World War II show that its industrial significance lay in its capability to extract toluene of specification grades of 96 per cent or greater purity.

A concentration of toluenes of purities between 80 and 85 per cent had no commercial significance during the period of negotiation between the United States and Continental, with respect to the sale of the former and the purchase by the latter of Plancor 882, and particularly with respect to the terms of the covenant in the deed.

The words "toluene" and "hydroformate" are highly technical terms, and at the trial both sides introduced expert evidence with respect to the meaning of such terms.

Expert witnesses called by Continental testified that by custom and usage the term "toluene," when not otherwise defined, meant specification grade toluene of 96 per cent or greater purity.

Until World War II the coal tar industry dominated the market for specification grade toluene. Specification grade toluene embraces three grades: Nitration grade, which is 99 per cent pure, or greater; industrial grade, which is 98 per cent pure, or greater; and commercial grade, which is 96 per cent pure, or greater. Those grades were established by the coal tar industry long before World War II and remained in effect throughout the period involved in this law suit. Ninety-six per cent toluene is used in the manufacture of paints, synthetics, and like products.

Continental's expert witnesses further testified that the transportation industry, in its freight rate tariffs, regarded the term "toluene" as applicable to toluenes of the above grades, and as not including aromatic solvents like ABC, the toluene content of which was less than 85 per cent; that the freight rate on toluene of 96 per cent or greater purity was higher than the rate for aromatic solvents containing less than 85 per cent toluene; and that import tariffs made a like distinction, toluene of 96 per cent or greater purity being importable duty free and products containing less than 85 per cent of toluene being subject to import duties.

The trial court found that the words "toluene" and "hydroformate" are high-

ly technical terms; that nitration grade toluene used in the manufacture of TNT is not less than 99 per cent pure; that industrial grade toluene, suitable for aviation gasoline blending, is not less than 98 per cent pure, and that commercial grade toluene is not less than 96 per cent pure; that the last-mentioned grade has certain recognized industrial uses in the manufacture of synthetics, paints, and other like products; that at the time of the execution and delivery of the deed, under the usage and customs in the industries which produce and use toluene, a product which was less than 96 per cent toluene was not referred to or regarded as toluene, but was known and referred to under a variety of other names, usually trade names like ABC; that at such time, in the railroad industry, tariffs prescribing the freight rates for toluene were applied only to toluene of 96 per cent or greater purity, and that at such time in tariffs providing a shipping rate for a product which was toluene of less than 96 per cent purity, such product was not regarded as toluene and the rate therefor was lower than the rate for toluene of 96 per cent or greater purity; that at such time import tariffs fixed by the federal government permitted the importation of toluene of 96 per cent or greater purity duty free, but toluene which was of less than 96 per cent purity was subject to import duties; and concluded that at the time of the execution and delivery of the deed and the agreement of the parties with respect to the terms of the covenant therein, the generally accepted meaning of the term "toluene" in this country in the petroleum, coal tar and other industries, under railroad tariffs and under import tariffs, was toluene of 96 per cent or greater purity; and that any substance containing less than that degree of purity was known and regard-

ed as something other than toluene, and depending upon the use thereof was referred to by a variety of other names; that nothing like or resembling ABC had been generally produced or used in the petroleum industry for aviation gasoline blending at the time the deed was executed and delivered; that the specification of the United States for toluene for aviation gasoline blending during World War II was 98 per cent purity or better; and that the parties used the technical term "toluene" in the covenant to denote specification grade toluene of 96 per cent or greater purity.

The court further found that while the end product "platformate" is substantially the same as "hydroformate," the former was produced by a different process and that it could be produced more easily and at less cost than hydroformate. The trial court concluded that under all the circumstances a technical approach should be adopted, and that platformate should not be termed hydroformate within the intent and meaning of the contract.

The findings of the trial court with respect to the meaning of the term "toluene" are fully supported by the evidence and the inferences reasonably deducible therefrom and are not clearly erroneous. It follows that it is unnecessary for us to determine whether hydroformate embraces the product referred to as platformate.

The cardinal rule in the interpretation of contracts is to ascertain the mutual intention of the parties at the time their minds met upon the terms of the agreement.[6]

Ordinarily, the construction of a contract presents a question of law, to be determined by the court.[7]

Where, however, to ascertain the meaning of the terms in a contract, re-

---

6. Victory Investment Corp. v. Muskogee Electric Traction Co., 10 Cir., 150 F.2d 889, 893;
New York Casualty Co. v. Sinclair Refining Co., 10 Cir., 108 F.2d 65, 69.

7. United States v. Nickel, 10 Cir., 243 F.2d 924, 925; J. T. Majors and Son, Inc. v. Lippert Bros., Inc., 10 Cir., 263 F.2d 650, 653, 654;
Texas and St. Louis Ry. Co. v. Rust, C.C.Ark., 19 F. 239, 243.

sort must be had to extrinsic evidence, and the evidence is in conflict or more than one reasonable inference may be drawn therefrom, a question of fact, rather than law, is presented.[8]

 When technical terms are used in a contract and are not therein defined, and resort must be had to the testimony of experts with respect to their meaning, the meaning of such terms becomes a question of fact for determination by the trier of the facts.[9]

Here, the trial court found as a fact that the word "toluene," as used in the covenant of the deed, did not embrace toluene that was less than 96 per cent pure. That finding was supported by substantial evidence and was not clearly erroneous.

It becomes unnecessary to determine whether the term "hydroformate" embraced the term "platformate."

It follows that the judgment of the trial court should be and it is affirmed.

---

8. J. T. Majors and Son, Inc. v. Lippert Bros., Inc., supra;
Evensen v. Pubco Petroleum Corp., 10 Cir., 274 F.2d 866, 872.

9. Goddard v. Foster, 12 Wall. 123, 84 U.S. 123, 142, 21 L.Ed. 589;
Great Northern Railway Co. v. Merchants Elevator Co., 259 U.S. 285, 291, 292, 42 S.Ct. 477, 66 L.Ed. 943.