J. R. LEWIS, d/b/a Four Seasons
Mobiland, Appellant,

v.

ANCHORAGE ASPHALT PAVING CO.,
an Alaska Corporation, Appellee.

No. 2136.

Supreme Court of Alaska.

May 21, 1975.

———◆———

Raymond A. Nesbett, Anchorage, for appellant.

Karl L. Walter, Jr., of Groh, Benkert & Walter, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

## OPINION

BOOCHEVER, Justice.

This appeal arises out of a suit by Anchorage Asphalt Paving Co. (hereinafter Anchorage Asphalt) to recover certain payments due upon a paving contract it had entered into with J. R. Lewis. Lewis asserts that the paving job done pursuant to the contract was performed in such a manner as to constitute a breach of certain express and implied warranties that the project would be executed in a workmanlike manner. In his counterclaim, Mr. Lewis seeks damages in an amount necessary to repair the deteriorating streets of his trailer court to the extent that the deterioration is attributable to the breach of contract.

The trial court rendered a judgment for Anchorage Asphalt for the unpaid balance of the contract price plus interest. Lewis on appeal seeks reversal of that decision on the grounds that certain of the trial judge's findings of fact were clearly erroneous, and that he misconstrued the law applicable to this case.

I

## STATEMENT OF FACTS

In approximately 1965, Mr. Lewis [1] purchased 40 acres of land near Anchorage, Alaska and he began, shortly thereafter, to develop this tract into a trailer court which he named Four Seasons Mobiland. Since much of the property was composed of peat the first phase of development required that this portion be filled in and leveled to create a stable surface acceptable for trailer sites. Much of the fill was obtained by cutting into a high hill in the southeast corner of the property and then spreading this soil, which was composed primarily of glacial till, over the peat according to an established grade which would provide proper drainage. Glacial till is the residue deposited by a retreating glacier composed of boulders, gravel, dirt, clay, some sand and a fine silt all intermingled. In its natural state, it resembles hard pack and is a very stable material. When the material is removed and disturbed, it tends to revert to its separate components and must be compacted to a high degree in order to make it stable so

---

1. Mr. Lewis received a degree in engineering from a California college. He took courses on the load bearing capacity of different soils and has had extensive experience in structural engineering and design. Although he worked for the design section of the California Highway Department for parts of 1948 and 1949, he did not have any special training in soils and soil testing as that subject would relate to highway construction.

as to support heavy loads. Thus, the ground upon which the trailer court was located consisted of an upper layer of fill ranging in depth from two to six feet resting on a peat base which itself would range up to ten to twelve feet in thickness.

For the most part, Mr. Lewis acted as the general contractor. He did some of the filling himself, and the rest was done by a subcontractor. The over-all design of the trailer court was the handiwork of Lewis and his mechanical engineer. In particular, Lewis located and designed the streets. For the first year as a temporary measure, Lewis put a one- to two-foot layer of pit run gravel in the roadbeds since the glacial till alone was not a suitable road surface. At that time, there were only three streets servicing his original two rows of trailers. It was anticipated that these roads would eventually be paved.

In 1968, Lewis contracted with a different company, Alaska Asphalt Paving Company, to pave those first three streets. He specified that he wanted a "cold mix" or "chip and penetration oil mix" used since it was cheaper than asphalt, and he had seen this method used with some success on other roads in the vicinity. The three roads (32,000 square feet) were paved at a cost of $14,000. Unfortunately, snow removal equipment scraped and peeled away much of this fragile surface that following winter.

In the summer of 1969, Lewis decided to have four new streets of his trailer court paved, and the three old streets repaved. He realized that the loss on the first job had been due to his own inexperience. This time he wanted the streets paved with the more durable hot mix asphalt. He testified that he had asked for a "good" and "complete" paving job during the preliminary negotiations indicating he wanted the contractor to do whatever was necessary to achieve a satisfactory pavement which would last the normal useful life (ten to fifteen years).

He solicited bids by Telephone from three contractors. Other than the fact that he wanted hot mix asphalt, Lewis presented no plans or specifications for the paving job and even left the amount of asphalt surface to be applied up to the discretion of the contractor. Lewis chose to accept the bid from Anchorage Asphalt.[2]

Before making the bid, Joe Longoria, Vice-President of Anchorage Asphalt, spoke with the defendant who indicated that he wanted a good paving job. Later, Julian Longoria, another representative of the company, came out to look over the site. Finally, Joe Longoria himself came out to examine the trailer court premises in order to prepare his bid. He rode around the area in a car. He saw what looked like gravel in the roadbeds although he did not get out of the car to conduct a more thorough inspection of the soils. Joe Longoria did not see any peat nor did he inquire of Mr. Lewis what type of soil was under the surface fill. He did observe that there was some earthwork being done in the trailer court, and he assumed from this that the excavation and backfilling of the roadbeds would be done by others prior to and independent of the paving obligation. At no point in the record is there any indication that Mr. Lewis intentionally concealed any information relating to the condition of the premises, composition of the soil, etc.

The contract entered into was drafted by Joe Longoria on a standard Anchorage Asphalt form. The bid proposal read as follows:

Install A. C. paving on new road and repair paving on existing roads with 2″ A. C. mix. The subgrade will be prepared by us and paved for $2.50 per square yard. The estimated area to be paved is 18,586 square yards. Actual field measurements will determine the total amount of this contract upon completion of work. We will provide fundamental

2. The bid eventually submitted from Alaska Asphalt was for $2.25–2.35 per yard; Anchor-age Asphalt bid $2.50 per yard and Northern Paving bid $2.86 per yard.

engineering for $500.00. In all cases the unit price will prevail.

This was followed by a brief section stating certain guarantees and making certain disclaimers.

All material is guaranteed to be as specified. All work is to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from above specifications involving extra costs will be executed only upon written orders, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents or delays [are] beyond our control. Owner to carry fire, tornado and other necessary insurance. Our workers are fully covered by Workmen's Compensation Insurance.

Anchorage Asphalt performed the contract by shaping and compacting the existing fill that was in the designated roadways and then spreading two inches of asphalt directly on top of the fill material. The total contract price based on surface area paved came to $57,052.50. Lewis made the initial down payment of $10,000 on September 1969 and five monthly installments of $4,000 each (reduced from $5,000 per month by agreement of the parties) in October, November and December of 1969 and February and April of 1970. This totaled $30,000 leaving a balance of more than $27,000.

Mr. Lewis claimed that minor defects and deficiencies began to appear in the pavement some three to four weeks after the completion of the streets. Although he was outside the State for much of the winter of 1969–70, he was kept advised of the worsening situation by his manager, Fred Sampson. Lewis directed the manager to contact Anchorage Asphalt and tell someone to come out to see what could be done. The wife of the manager made this telephone call, but she was told that there was no guarantee on the roads.

Of the seven streets paved by Anchorage Asphalt (four new streets and the three old ones which were repaved), the three northernmost new streets suffered the most rapid deterioration over the course of the first year. Portions of these streets settled causing a roller-coaster effect. This settlement interfered with proper drainage and caused ponding in the lower areas which would freeze during the night. Potholes, cracks and alligatoring[3] also appeared. At that time, the one other new street and the three older ones exhibited only minor defects. However, by the time this case came up for trial in July 1973, the pavement on these four streets too had begun to break up. Lewis estimated that these streets were a 30 to 50 percent failure whereas the three northerly streets were a total loss and would have to be completely rebuilt. Unlike the three northerly streets where the basic problem was a settlement leading to roller-coastering, the primary defects in the remaining streets were cracks and holes, not sinking.[4]

Anchorage Asphalt's position at the trial was basically that the term "prepare subgrade" did not encompass the laying of a crushed rock or gravel subgrade. It asserted that the asphalt used was not defective, and it denied the existence of any implied warranty of the roads other than as to the quality of the materials used. It further denied any duty on its part to warn the defendant of the potential for failure due to the inadequacy of the subgrade material.[5]

3. "Alligatoring" is a cracking of pavement giving the appearance of an alligator's hide. It is generally associated with high moisture content and a loss of structural stability in the material directly under the pavement.

4. Lewis' expert witness estimates the cost of repair and reconstruction of all the streets to be in the neighborhod of $81,000. This included excavating and filling.

5. Anchorage Asphalt's expert witness testified that the primary cause for the settlement of the three northerly roads was the softness of the underlying peat. The settlement may have been exacerbated by the activity of heavy construction equipment in that sector of the trailer court during the summer the streets were paved. He stated that he was unaware of any recognized standards for road construc-

Lewis argued that there were express and implied warranties that the work would be done in a workmanlike manner which included placing a layer of gravel under the asphalt if necessary for a properly built subgrade.[6]

At the conclusion of the trial, Judge Kalamarides, sitting without a jury, found, *inter alia,* that there was in fact an uneven settling or roller-coaster effect, alligatoring, potholes and breaking up of the surface of portions of the roads. The failure was attributed to moisture in the subgrade that caused the road surfaces to heave and settle unevenly as a result of freezing and thawing action, and the saturation of the glacial till material that was basically used as a subgrade. The paving laid down was of high quality, and the failure of the roads was not the fault of Anchorage Asphalt. The judge found that Lewis knew of the conditions of the soils underlying the roads and failed to advise Anchorage Asphalt as to those conditions and that Lewis had a duty to so advise Anchorage Asphalt. Judgment was awarded in favor of Anchorage Asphalt in the amount of the balance due under the contract plus interest and against Lewis on his counterclaim.

Lewis has appealed contending, basically, that the court erred:

1. By not finding that the contractual provision, to "prepare the subgrade", required that Anchorage Asphalt do whatever was necessary to see to it that there was a proper subgrade before paving over it, and

2. By not finding that Anchorage Asphalt had breached its express and implied warranties to do a "workmanlike job in accordance with standard practices".

II

PREPARATION OF THE SUBGRADE

The bid prepared by Anchorage Asphalt and accepted by Lewis provided that "the subgrade will be prepared by us and paved for $2.50 per square yard". The failure of the streets was attributed to the nature of the subgrade. Lewis contends that the phrase "the subgrade will be prepared by

tion over a peat base other than complete removal of the peat which requires extensive excavation. He did seem to admit that the placing of a layer of gravel (12 inches) might have resulted in a reasonably acceptable road surface, though by no means one that he would guarantee. He also stated that there were no standard practices for street construction in trailer courts in the Anchorage area in 1969.

The expert attributed the cracking and alligatoring on the surfaces of the four new roads to the presence of frost susceptible material immediately below the surface of the road. Thus, a gravel layer would have helped to prevent this damage. However, he would classify such work as road construction and not a mere paving job. He stated that his interpretation of the term "prepare subgrade" would include grading, shaping and compacting the roadbed provided by the owner or other contractor. In his opinion, it would have been almost impossible to have done an adequate paving job that would be free of unevenness and cracking considering the frost suspectible quality of the glacial till and the difficulty of compacting that type of soil when it has a layer of peat beneath it.

6. Testimony by Mr. Lewis' expert indicated that it was a standard practice to utilize a gravel layer of varying depths (in lieu of complete removal of peat) when paving roads over peat, and he would have recommended a gravel layer at least one foot in depth. In any event, he attributed most of the damage to the four new roads—both the heaving and the cracking—to the direct application of the asphalt paving on the glacial till. In some cases, such soil may have enough gravel in it to be a fairly stable subsurface but for the most part, the presence of a large amount of frost susceptible fine materials render it unstable. Such soil is subject to expansion, cracking and heaving. Thus, the roller-coastering was due more to the differential heaving of the glacial till than to the uneven settling of the underlying peat.

The three old roads, according to Lewis' expert, did not sink because they already had an adequate gravel subgrade. The problem there was the gradual breaking up of the pavement. He felt this was probably due to the fact that Anchorage Asphalt had inadvertently mixed in glacial till soil in regrading those streets which led to frost expansion directly beneath the surface of the pavement. This opened up hairline fissures which, in turn, let in more moisture leading to more and larger cracks.

us" should be given the interpretation that Anchorage Asphalt had a duty to do whatever was necessary to see to it that there was an adequate subgrade "going as deep as necessary to accomplish the job". On the other hand, Anchorage Asphalt argues that the language referred only to shaping and compacting the existing surface, that is scraping the existing roads smooth with a grader, shaping them so as to achieve drainage and compacting them before paving.

Although extensive evidence was submitted without objection as to the intent of the parties, the objects sought to be accomplished and the surrounding circumstances with reference to the phrase "the subgrade will be prepared by us", Lewis now takes the position that the language is unambiguous and should be interpreted "objectively" without regard to that testimony. Although the term "subgrade" appears to have a well-recognized meaning pertaining to whatever is below the surface of the pavement, the issue in this case is what is meant by "preparing" it. Does it require excavation and placing a layer of an alternate subgrade if the contractor perceives the necessity for a more suitable material? On this point the experts were divided. Mr. Galliet, testifying on behalf of Lewis, believed the term included doing whatever was necessary to insure an acceptable paving job. Anchorage Asphalt's expert, Mr. Beyer, believed that preparing the subgrade did not mean providing the subgrade material (e. g. a layer of gravel, etc.). It involved only shaping and compacting whatever material was there.

We find that the term is subject to varying interpretations. The trial judge accepted the interpretation advocated by Anchorage Asphalt and its expert. He made this decision by resolving the conflicts in the testimony of the experts and of the parties. Where interpretation of a written instrument turns on the acceptance of extrinsic evidence, the process of weighing such evidence should be for the trier of fact.[7]

That such questions are for the trier of fact is especially true where the interpretation of a technical term is involved. The Supreme Court of Nebraska has held:

> Where a technical term is used in a contract, and expert witnesses differ as to its meaning and what it implies, and the evidence relating thereto is in conflict, then the matter becomes a question of fact for the jury.[8]

Likewise, in United States v. Lewiston Lime Co.,[9] the court, in interpreting the phrase "costs of transportation and treatment" as it applied to a limestone quarry operation, stated:

> The proper interpretation of ambiguous contractual provisions is a mixed question of fact and law. The factual issues include the meaning of the terms asserted to have technical, trade meanings.[10]

We conclude that the trial court's interpretation of the words "the subgrade will be prepared by us" to mean shaping and compacting the existing material constitutes a finding of fact dependent upon the weight given to the conflicting extrinsic evidence. We cannot set aside that finding since it is not clearly erroneous.[11]

7. Hendricks v. Knik Supply, Inc., 522 P.2d 543, 547 (Alaska 1974). Cf. Day v. A & G Constr. Co., Inc., 528 P.2d 440, 443 (Alaska 1974).

8. State v. Commercial Casualty Ins. Co., 125 Neb. 43, 248 N.W. 807, 810 (1933).

9. 466 F.2d 1358 (9th Cir. 1972).

10. Id. at 1359 n. 1. Citing United States v. Continental Oil Co., 364 F.2d 516, 522 (10th Cir. 1966). See also R. P. Farnsworth & Co.

v. Tri-State Constr. Co., 271 F.2d 728, 733 (5th Cir. 1959), wherein it was stated:
> The construction of the written contracts was, of course, for the court, though factual issues were presented as to the meaning and purpose of certain technical words and ambiguous terms, such as "pilot house" and "shop drawings". (footnotes omitted).

11. Alaska R.Civ.P. 52(a). See Hendricks v. Knik Supply, Inc., 522 P.2d 543, 547 (Alaska 1974).

III

## WARRANTIES

Before discussing Lewis' contention that Anchorage Asphalt breached its express and implied warranties, we must decide whether that issue is properly before this court. Anchorage Asphalt asserts that Lewis failed to specify the warranty question in its statement of points on the appeal as required by Alaska R.App.P. 9(e).[12]

Admittedly, the words "express or implied warranty" do not appear in the appellant's statement of points on appeal. However, Points 6 and 12 assert that the trial court erred in finding that the subgrade was properly prepared by the plaintiff in accordance with the "requirements of the written contract" and the "express contractual requirements". These phrases certainly include the express warranty provisions which were requirements of the contract. Furthermore, to hold that there has been a waiver as to the implied terms would require an overly narrow reading of Appellate Rule 9(e) since such terms, having been purposefully written into the contract by judicial decision, should be of the same stature as express terms written into the contract by the parties.

■ The purpose of Appellate Rule 9(e) is to have the appellant concisely outline what he considers to be potential sources of error constituting the bases for the appeal. This enables the appellee to designate additional portions of the record and transcript as may be deemed necessary and furnishes the appellate court with a statement of the issues. It does not require an elaboration of the legal theories on which the appeal is based.

■ Orbeck v. Wheeler Construction Co.[13] cited by Anchorage Asphalt is distinguishable from the instant case for there the appellant failed to file *any* statement of points on appeal.[14] Since the rule was totally ignored, and, there being no plain error, we found it proper to dismiss the appeal, stating:

This court is not inclined to cut off rights of appellate review because of some failure on the part of a litigant to comply with the rules, if to do so would work surprise or injustice or would result in countenancing plain error apparent on the face of the record. However, we must also remain mindful of the fact that the rules are designed to facilitate business and to assure an orderly procedure on appellate review and should therefore be enforced by this court.[15]

The court's interest in orderly appellate procedure is inapplicable to a case where the party has filed a statement in which broader language (e. g. breach of contract) includes the narrower issue actually briefed (e. g. breach of a warranty arising from the contract). Therefore, while it would have been preferable had the statement of points been more specific, the issues concerning both express and implied warranties are properly before the court.[16]

■■ Turning to those warranties, we note that the contract, drafted by Anchorage Asphalt and signed by the parties, includes the following express warranty:

All material is guaranteed to be as specified. All work is to be completed in a

---

12. Appellate Rule 9(e) specifies:
The appellant shall serve and file with his designation a concise statement of the points on which he intends to rely on the appeal. The court will consider nothing but the points so stated. On motion, and for cause, the statement of points may be supplemented subsequent to the filing of the designation of record.

13. 394 P.2d 781 (Alaska 1964).

14. The court was interpreting Supreme Court Rule 9(e) which was somewhat different in form from the present Appellate Rule 9(e). However, the changes in language are of no consequence to this appeal.

15. 394 P.2d at 782–83 (footnote omitted)

16. Sinka v. Northern Commercial Co., 491 P.2d 116, 120 (Alaska 1971); Rego v. Decker, 482 P.2d 834, 841 (Alaska 1971).

workmanlike manner according to standard practices.

Furthermore, it is well settled that, in building or construction contracts whenever someone holds himself out to be specially qualified to do a particular type of work, there is an implied warranty that the work will be done in a workmanlike manner, and that the resulting building, product, etc. will be reasonably fit for its intended use.[17] Thus, there was also an implied warranty to perform the contract in a workmanlike manner which was virtually coextensive with the express warranty cited above.

▪ The scope of these warranties, however, is directly related to the scope of the duties and obligations imposed on the parties by their contract.[18] One of the main thrusts of Lewis' argument has been disposed of by our holding that the trial court's finding that the requirement to prepare the subgrade encompasses only grading, compacting and shaping the subgrade material. Lewis contends that preparation of the subgrade in a workmanlike manner would have involved placing a layer of more suitable subgrade material under the asphalt. This issue depends upon whether or not Anchorage Asphalt was obligated to do more than it did with regard to the subgrade. And we have held that the trial court's finding as to that requirement was not clearly erroneous.

▪ There is no dispute as to the quality of the asphalt used on the streets. Although there was some issue as to the adequacy of the compaction of the subgrade, the trial court held directly that Anchorage Asphalt was not responsible for the deterioration of the streets and, therefore, indirectly that the preparation of the subgrade, including its compaction, had been performed in a workmanlike manner. While the evidence was in conflict as to the compaction, we cannot say that the court's findings were clearly erroneous.

▪ Similarly, Lewis' argument that this was an "end result" contract [19] and that the final product was defective is de-

17. Economy Fuse & Mfg. Co. v. Raymond Concrete Pile Co., 111 F.2d 875, 878 (7th Cir. 1940); Kubby v. Crescent Steel, 105 Ariz. 459, 466 P.2d 753 (1970); Gilley v. Farmer, 207 Kan. 536, 485 P.2d 1284 (1971); Hotchner v. Liebowits, 341 S.W.2d 319 (Mo. App.1960); McCool v. Hoover Equipment Co., 415 P.2d 954, 958 (Okl.1966).

18. In construction contracts where the laying of a foundation or supportive structure is clearly perceived by the parties to be within the terms of the contract, it is generally held that the builder's implied warranty to build in a workmanlike manner encompasses responsibility for defects in the foundation. *See* Nelson v. Hazel, 89 Idaho 480, 406 P.2d 138 (1965) (builder constructing fireplace and chimney had duty to provide adequate foundation to prevent sagging and cracking of the structure: failure was breach of implied warranty to build in a workmanlike manner). *See also* Underwood v. Marberry Constr. Co., 74 N.M. 664, 397 P.2d 311 (1964) (imperfections and cracks developing in newly constructed house due to the fact that the house was built on loose filled soil constituted a breach of a similar express warranty); Dearstine v. Dunckel, 130 Misc. 281, 223 N.Y.S. 234 (1926), rev. on other grounds 223 App. Div. 795, 228 N.Y.S. 191 (where plans are silent, contractor's duty is to produce a level structure even if it is necessary to further excavate and fill).

19. The nature of the contract determines to a large degree who is liable for defects in the end product. If the contract calls only for a certain result, then the contractor must rely on his own expertise in devising a satisfactory means of achieving that end. The contractual obligations will not be excused nor will he become entitled to extra compensation if unforeseen difficulties are encountered. United States v. Spearin, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166, 169 (1918); Kansas Turnpike Authority v. Abramson, 275 F.2d 711, 713 (10th Cir. 1960). On the other hand, if the contractor is bound to build according to detailed plans and specifications prepared by the owner or prime contractor, he will not be held liable for defects in the end product which are caused by deficiencies in the specifications as long as he performs the work according to the plans and in a workmanlike manner. This is so:

. . . [E]ven if he deems them improper and insufficient; and therefore cannot be held to guarantee that work performed as required by them will be free from defects, or withstand the action of the elements, or accomplish the purpose intended. Kansas

pendent upon the designation of the "end result" agreed to by the parties to the contract. As interpreted by the trial court, the contract required preparation of the subgrade by grading, compacting and shaping, and placing on it a suitable asphalt paving. The trial court found that Anchorage Asphalt properly performed those duties and that the failure was not attributable to improper performance of those contractual duties. The contract as interpreted by the trial court did not call for the entire construction of the streets including possible excavation of peat and placement of fill, prior to the preparation of the subgrade and placement of the paving. The trial court did not clearly err in finding that Anchorage Asphalt physically accomplished the work it had agreed to perform.

■ We find more substance in the contention that Anchorage Asphalt breached its contract to complete its work in a workmanlike manner according to standard practices, by virtue of its failure to warn Lewis that a suitable result could not be obtained by placing the paving on the glacial till material covering the peat.[20] All of the expert testimony was to the effect that it was not standard practice to place paving directly on a frost susceptible material such as glacial till without use of a gravel base.

Moreover, it was undisputed that Anchorage Asphalt gave no warning that the paving was apt to fail if placed directly on the glacial till. In that regard, it appeared to be the position of the company that there was no duty to warn. As stated by the company's vice-president: "If a man wants to pay me $2.50 a square yard for

putting it [paving] in mudholes, I will, yes. If it's within reason."

The trial court did not pass on this issue as the judge placed the affirmative duty on Mr. Lewis to inform Anchorage Asphalt that the existing fill was composed of glacial till covering peat. Anchorage Asphalt, a recognized expert in paving, apparently made no inquiry of Mr. Lewis as to the nature of the fill or subsurface, nor is there any evidence that its representatives attempted to make any independent investigation (soil testing). Finally, there is nothing in the record that even implies that Lewis had intentionally concealed the underlying soil conditions of his trailer court.

Indeed, one is hard put to imagine any conceivable advantage which might accrue to the defendant by such behavior. Of course, nondisclosure of unfavorable soil conditions might hold down the bid estimates as long as the negotiations were held at a distance by telephone. However, the plaintiff sent at least two of its owner-representatives to the site before drawing up its bid, and these men were free to question Lewis and make any tests they felt necessary. The paving contractors were experts presumably, and there was no need for them to assume facts or operate in the dark concerning information they felt relevant to the successful performance of the contract.

■ Under these circumstances, we know of no authority that would place an affirmative duty on the owner to inform the plaintiff of the fact that the fill was composed of glacial till and covered a peat base. In Morrison-Knudsen Co., Inc., v. State,[21] we held that the State of Alaska

TurnPike, *supra, quoting* Friederick v. Redwood County, 153 Minn. 450, 190 N.W. 801, 802 (1922).
*See* Hopkins Constr. Co. v. Reliance Ins. Co., 475 P.2d 223, 228 n. 8 (Alaska 1970).

20. Anchorage Asphalt argues that this issue was not properly before the trial court. The duty to warn was specifically brought up during final argument and in the cross-examination of Anchorage Asphalt Vice-President, Joe

Longoria. Although the judge's ruling permitting the testimony was somewhat ambiguous, we find that allegations in the complaint that the work was not performed "in accordance with proper construction standards" includes within its scope a duty to warn when required by such standards. That requirement is discussed later in this opinion.

21. 519 P.2d 834 (Alaska 1974).

had no duty to inform a dredging contractor of facts coming to the knowledge of the State's officials indicating that the method of dredging which the contractor stated he intended to use was not feasible. We stated:

> We read these cases as establishing the following test for imposing a duty to disclose upon the state: did the state occupy so uniquely-favored a position with regard to the information at issue that no ordinary bidder in the plaintiff's position could reasonably acquire that information without resort to the State? Where resort to the state is the only reasonable avenue for acquiring the information, the state must disclose it, and may not claim as a defense either the contractor's failure to make an independent request or exculpatory language in the contract documents.

> .    .    .    .    .    .

> "There has been no proof of fraud in any aspect of the case." In this connection we note that subsequent to the negotiated contract and after M–K was informed of the first Gorton report M–K engaged Gorton to supervise exploration for the purpose of determining whether hydraulic dredging was feasible. We think M–K could easily have conducted equally extensive research on its own, and was not dependent on the state as

the only reasonable avenue for acquiring that information. Accordingly, we hold that the state did not breach its duty to appellant in failing to disclose information it had received from the other bidders on the project.[22]

While *Morrison-Knudsen* involved a public contract, we see no reason why a different standard should be applied here. Anchorage Asphalt with its expertise could easily have ascertained the nature of the fill material and subsurface conditions. At the very least, it could have inquired of Mr. Lewis. We conclude that the trial court erred in holding that, in the absence of any intentional deception. Mr. Lewis had a duty to volunteer information as to the contents of the fill and underlying soil.[23]

Having reached this conclusion, we must decide whether Anchorage Asphalt had a duty to warn of the likelihood of failure of the paving under its agreement to perform the work in a workmanlike manner according to standard practices. We discussed such a duty in a footnote to our opinion in Nordin Constr. Co. v. City of Nome[24] stating:

> Such notice [of design defects] is generally required to be given the owner or the architect by the contractor where the latter has reason to believe the plans are defective, in order to protect the con-

---

**22.** *Id.* at 841–42 (citations omitted). The dissenting opinion of Justice Boochever joined by Justice Erwin in *Morrison-Knudsen* was based on the fact that the state had specific knowledge that the method to be pursued by the contractor could not be used successfully. There is no evidence that Lewis had such knowledge as to the method to be used by Anchorage Asphalt.

**23.** In Ford & Denning v. Shephard Co., 36 R.I. 497, 90 A. 805, 807 (1914), it was held that there was no duty of an owner to warn a contractor constructing the foundation for a boiler room of the presence of quicksand, and that, in the absence of intentional deception by the owner, the contractor remained liable. The court stated:

> We do not think that a knowledge of the quicksand on the part of the defendant,

disconnected from any attempt or intention on its part to conceal it from the plaintiffs, or to prevent or deter them from an examination of the premises, would be a sufficient justification for the breaking of the contract by the plaintiffs. If, however, . . . the character of the soil in that particular locality was a matter of common knowledge, the defendant might reasonably assume that the plaintiffs would be advised of it, or could easily acquire, and perhaps had acquired, a sufficient knowledge of it. It is well known that contractors before entering into a contract for work of that character usually subject the premises to examination, obtain borings, and otherwise satisfy themselves as to the underlying soil in which they are to operate.

**24.** 489 P.2d 455 (Alaska 1971).

tractor from liability for deficiencies caused by such defects.[25]

Of similar import is the holding of Rubin v. Coles,[26] a case involving a contract to build an extension to a building. The contractor followed the specifications, but since the extended foundation was built on loose filled soil, it began to buckle within two months of completion, and the structure was condemned by the city within two years. The court held:

It has been repeatedly held that, even though he be bound to follow fixed plans and specifications, the contractor owes the duty to examine such plans and judge of their sufficiency; that he is bound to discover defects that are reasonably discoverable or patent; and, where he knows or had reason to believe that the plans are defective, and follows them without pointing out such defects to the owner or architect, he is not entitled to recover if the building proves insufficient because of such defects.[27]

Thus, the contractor is required to bring his expertise into play and to notify even an architect (expert) of reasonably discoverable defects.

In the converse situation, Ridley Investment Co. v. Croll[28] involves a contractor who had undertaken to construct a building according to plans and specifications submitted by the owner and who notified the owner of soft soil conditions discovered during construction. The contractor was held not to be liable for the cost of repairing a floor which subsequently settled because he had notified the owner of the need for additional piling for both walls and floors, but the owner had authorized additional support only for the walls.[29]

These cases involved "plans and specifications contracts". There would appear to be even more reason to impose this duty upon a contractor of an "end result" contract if the owner is calling for an end product on a site or under circumstances which that contractor knows or should know are bound to lead to failure. This would further the policy which strives to avoid wasted effort and material whenever possible. Therefore, we hold that this duty to inform the owner, regardless of his personal expertise, of potential defects in his project which come to the contractor's knowledge or should come to his knowledge is an essential element of performing any contract in a workmanlike manner according to acceptable standards.[30] By this, we are not implying that a subcontractor has a duty to warn of defects in other parts of the project unless the defects are such as would likely cause the subcontractor's work to fail, and further are of a nature to place the subcontractor on notice of their exis-

25. *Id.* at 470 n. 26 (citations omitted).

26. 142 Misc. 139, 253 N.Y.S. 808 (City Court of N.Y.1931).

27. *Id.* at 811.

28. 192 A.2d 925 (Del.Super.1963).

29. *Cf.* Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819 (1949), where the contractor was found liable for the failure of a sewer system after informing the city that the sewer would so fail if he continued construction in accordance with the city's specification and after expressly disclaiming liability for the failure if the city would not issue a change order for the necessary materials. The harsh *Brasher* result is distinguishable from *Ridley Investment Co.* in that in the former case, the collapse occurred before final completion and acceptance, and the court invoked a special risk of loss rule it felt applied in those circumstances. Therefore, the two holdings might have been identical—i. e. relieving the contractor of liability once he has notified the owner of the difficulty—had the losses been suffered post-acceptance.

30. Nordin Constr. Co. v. City of Nome, 489 P.2d 455, 470 n. 26 (Alaska 1971); Northern Pacific Ry. Co. v. Goss, 203 F. 904 (8th Cir. 1913); Banducci v. Frank T. Hickey, Inc., 93 Cal.App.2d 658, 209 P.2d 398 (1949); Giles v. San Antonio Foundry Co., 24 S.W. 546 (Tex.Civ.App.1893). Rubin v. Coles, 142 Misc. 139, 253 N.Y.S. 808 (City Ct. of N.Y. 1931). *See generally* Northern Corporation v. Chugach Electric Ass'n, 523 P.2d 1243, 1246 (Alaska 1974) (on petition for rehearing).

tence. Both the case law referred to above and policy considerations dictate such a result.

The evidence was undisputed that placing paving directly on frost susceptible material was not in accordance with workmanlike standards since the result would be the precise type of failure of the paved surface which occurred here. If Anchorage Asphalt knew or reasonably should have known of the subsurface conditions, it had a duty to warn Mr. Lewis and is liable for the damages resulting from such failure to warn.[31] Having been warned, if Mr. Lewis then insisted that it was the contractor's duty to provide the gravel layer under the terms of the contract, the dispute could have been settled or litigated before the paving was applied, and the wasteful and unnecessary losses avoided. If Mr. Lewis accepted as his the obligation to provide the additional materials but declined to do so, the contractor would have been absolved.

The record is not clear as to whether Anchorage Asphalt may be charged with knowledge of the subsurface conditions. The trier of fact could find that as paving experts, they should have known the difference between an actual gravel base and glacial till that may look like gravel to the uninformed eye. The trial court may possibly be able to take the judicial notice of the high likelihood of peat lying beneath the surface in the area involved. On the other hand, there was some testimony to the effect that at least on the vice-president's initial cursory inspection, the fill material looked like gravel, and that he did not observe the peat. We, therefore, find it necessary to remand the case to the superior court for a determination of whether Anchorage Asphalt through its representatives knew or reasonably should have known that paving placed on the subsurface was likely to fail.[32]

Remanded.

---

31. If the court below reaches the issue of damages, they should be limited to those necessary to put Lewis in a good a position as that in which he would have been had such warning been given. Restatement of the Law, Contracts, § 329, Comment a, page 504. Since we have affirmed the trial court's finding that "preparation of the subgrade" involved only its "grading, shaping and compacting", damages should not include the costs of excavation and filling, but only the costs of removing the portions of paving that have failed, shaping and compacting the subgrade and replacing that pavement. The amount due and unpaid on the contract will be an offset against those damages, and if the amount due and unpaid exceeds the amount of the damages, Anchorage Asphalt will be entitled to an award for the difference.

32. The court in its discretion may take additional testimony as to this issue.