**W. A. MONCRIEF, Jr.,**
**Plaintiff-Appellee,**

v.

**MARTIN OIL SERVICE, INC., a corporation, Defendant-Appellant.**

No. 80–1067.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted July 16, 1981.

Decided Sept. 3, 1981.

John T. Mitchell, Kilgore & Kilgore, Inc., Dallas, Tex. (Fred N. Diem, Kilgore & Kilgore, Inc., Dallas, Tex., with him on the brief), for defendant-appellant.

Morris R. Massey, Brown, Drew, Apostolos, Massey & Sullivan, Casper, Wyo. (Wm. H. Brown, Brown, Drew, Apostolos, Massey & Sullivan, Casper, Wyo., with him on the brief), for plaintiff-appellee.

Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is an action seeking a construction of a written farmout agreement [1] between the plaintiff-appellee herein, W. A. Moncrief, Jr., and Martin Oil Services, Inc., the defendant-appellant. Martin owns certain oil and gas leases which are subject to a farmout agreement with appellee. Moncrief drilled the wells with which we are here concerned under the farmout agreement in order to earn certain interests in the subject oil and gas leases. Plaintiff-appellee maintains that he has drilled the wells in compliance with the farmout agreement and that the drilling of such wells entitled him to an assignment of the maximum interest earnable under the terms of the farmout agreement. Martin denies that appellee has drilled any wells which are in compliance with the farmout agreement with the exception of the Long Butte Unit No. 30–1X, here called the "Test Well". Martin contends that appellee did not strictly conform to the agreement's terms and is therefore entitled to an assignment of only that interest which he may have earned through the drilling of the Long Butte Unit 30–1X. The litigation pertains to the meaning of the farmout agreement, dated March 1, 1971, together with a letter of transmittal dated March 25, 1977, which forwarded the farmout agreement to appellee for execution.

Moncrief was shown to have been for some period of time drilling deep high pressure gas wells in the Wind River Basin of Wyoming. He has been active in the deep drilling operations in an area called the Madden Deep Unit, which is a large area unitized for the development and production of oil and gas under the surveillance of the United States Geological Survey, U.S. G.S., of the Department of the Interior. Moncrief apparently had the special equipment used for drilling the kind of deep wells that were here necessary.

Martin Oil Services, Inc., is a Chicago based corporation, the principle business of

---

1. This is an agreement between a driller and a lessee under which the holder of a lease grants an interest to a driller if the latter drills a well on the lease.

which has been the marketing of oil and gas. Martin also engages in oil and gas exploration and production. As of mid-1976 Martin owned oil and gas leases covering approximately 2500 acres in the vicinity of the Madden Deep Unit. Several of Martin's leases in the area had early expiration dates and these dates threatened to cause the leases to expire unless extended by establishment of production thereon or by commitment to a federal type unit on which drilling operations could be conducted.

Martin had been unable to form a federal type unit encompassing its lands. Martin was anxious, of course, to farm out its leases to obtain evaluations of its interest prior to the time of expiration and to secure the organization of a unit. Moncrief had an interest in the productive potential of deep horizons in the area in question.

Because of their reciprocal interests Martin, in a mailgram, granted an option to Moncrief. The mailgram recited Moncrief's agreement to form a federal type unit encompassing the Martin acreage subject to the option. The terms of the option were that by the drilling of a unit well to a depth sufficient to test certain deep horizons Moncrief would earn the option to drill a similar deep test on Martin's acreage, thereby earning a 100% interest in the deep rights as to the latter drill site (subject to a convertible overriding royalty interest to be retained by Martin) together with an undivided 75% interest in the deep rights under Martin's leases outside the drill site. Also in the mailgram it was recited that a mutually satisfactory contract and operating agreement would be entered into before the option was exercised.

It should be noted here that Moncrief was able to obtain that which Martin had been unable to obtain, the necessary commitments and receive the final approval of the Long Butte Unit from the area Oil and Gas Supervisor of U.S.G.S. on or about October 26, 1976.

Subsequently the lawyer for Martin, Mr. Henshall, undertook to draft the farmout agreement. It provided in the initial draft that by the drilling of the optioned well, Moncrief would earn a 100% interest in the drill site tract for the test well, subject to the reservations by Martin of a 1/32 overriding royalty interest convertible on pay-out of the test well into a 25% working interest therein, together with a 75% interest in the Martin acreage outside the drill site tract. There was a provision in the final draft which would reduce the interest earned by Moncrief in the Martin acreage to that proportion thereof which the amount of the Martin acreage within the participating area for the test well would have to the total acreage within the participating area.

The agreement was not forwarded to Moncrief until January 25th, 1977. At that time Moncrief and his exploration manager reviewed the draft, and the part which threatened dilution of the interest in the Martin acreage due to the operation of the proportionate reduction provision was a concern to Moncrief. He took the position at that time that he should be entitled to earn an ultimate undiluted 75% interest in all Martin acreage. This matter was discussed between the representatives of the parties and Moncrief's suggested means of alleviating the concern was communicated by telephone several times. Moncrief suggested that in the event the participating area of the option well included acreage other than Martin acreage with a consequent dilution, Moncrief would pay the portion of the cost of drilling all exploratory Long Butte Unit wells attributable to Martin acreage until such time as the sum of such fractional cost shares equalled one well. Moncrief expressed a willingness to bear 100% of the cost of one full well whether it consisted of the cost of drilling a single test well or consisted of the sum of the cost of an initial test well plus partial interest in one or more additional test wells. Finally, in March 1977 Martin's representative expressed willingness to resolve the concern of Moncrief by the means suggested by the latter. Park, Moncrief's manager, requested of the representative of Martin to evidence the agreement by letter, which he did in the March 25, 1977, transmittal letter. That letter states as follows:

Pursuant to our telephone conference of March 24, 1977 enclosed are two copies of the referenced Farmout Agreement which have been executed by this Company. I would appreciate it if you would review the enclosures and, if acceptable, return one fully executed copy to this office.

As we discussed, your Monsanto well now being drilled in Section 32, Township 39 North, Range 91 West is the well referred to in Paragraph 1 of the Farmout Agreement and upon completion of that well your Company will be entitled to drill the Test Well on our acreage under the Agreement.

It is also our understanding that your Company will drill us one free well to earn its interest in our acreage, and if our acreage on the first Test Well does not earn your Company its full interests under the Agreement, that the drilling of subsequent tests can earn the interest agreed to.

If you have any questions regarding the enclosures, please feel free to give me a call.

The parties acknowledged that this letter was effective as an amendment to the farmout agreement. The "subsequent tests" referred to in the letter of transmittal is the matter at issue here. The question is whether the subsequent tests contemplated by the amendatory letter of March 25th were required to meet all the qualifications of a "Test Well" in the main instrument. These qualifications were as follows:

1. Drilling had to be commenced within 180 days after completion of the initial unit well or by September 30, 1978, whichever date was earlier.

2. The well had to be drilled by Moncrief himself, at his own expense.

3. Martin acreage had to be the physical site of the well.

4. The well had to be an exploratory well as defined in the operating agreement.

It was Martin's contention that the following language expressed the requirement that the subsequent tests be physically located on Martin acreage " * * * it being the intent of the parties hereto that the interest earned by operator (Moncrief) hereunder shall be in consideration for the drilling of a well on lands belonging only to Martin." This language was held by the trial court to be consistent with the concept that one full well would be drilled, whether it constituted a single well or an aggregation of partial interests in several wells.

It is also the contention here of Martin that all of the "subsequent tests" referred to in the letter quoted above, which is part of the agreement, had to be commenced within the same time limit as the Test Well (that is 180 days after completion of the initial unit well). It is further asserted that these wells had to be drilled by Moncrief himself at his expense and that they must be actually drilled on Martin acreage and that they must be exploratory wells as defined.

Moncrief's responsive contention is that if he has drilled a particular "Test Well" meeting all such qualifications, he is entitled to drill and has in fact drilled partial interest wells with respect to which Martin acreage is included in the drilling units and will be included in the resulting participating areas. Moncrief contends further that he is obligated to pay the share of the costs attributable to the Martin acreage until the contemplated one full well has been drilled.

The additional wells which Moncrief has drilled meet the second and fourth qualifications, that is the requirement that the wells must be drilled at Moncrief's expense and the requirement that the wells must be "exploratory wells" as defined in the operating agreement. The question then is reduced to whether the first and third qualifications must be followed with respect to additional wells. The first is the drilling must be commenced within 180 days after completion of the initial unit or by September 30, 1978. The third requirement is whether they must be located on Martin acreage.

The Long Butte Unit 30–1 well or its substitute drilled by Moncrief met all the

qualifications for the test well. Moncrief commenced this well within the 180 day period after completion of the unit well. He drilled it himself at his own expense. Martin acreage constituted the entire drilling unit and Martin acreage by reason of the drilling and completion of this well would be included within the resulting participating area. This well was an exploratory one as defined in the operating agreement and was physically located on a Martin lease. The Long Butte Unit 30–1 well had been drilled to the planned depth when, as the result of a ruptured casing, the well was lost. Moncrief immediately commenced drilling a substitute well at the same location, designated as the Long Butte Unit 30–1X well. The Long Butte Unit 30–1X well was completed as a productive gas well shortly prior to trial. The Long Butte Unit 30–1X well met all the requirements for a Test Well and Martin so concedes.

Moncrief provided Martin with daily drilling reports on all the wells on which there was shown the costs of operations on the well for the day reported and the cumulative total costs for the well from commencement through the day of the report. There is nothing in the record to indicate that at any time Martin paid Moncrief the costs advanced by Moncrief. Martin's leases were saved from expiration as intended by the farmout agreement and Martin obtained its objectives, an evaluation of the potential of the deep formations.

The trial court ruled that Moncrief gave the full measure of performance under the contract to entitle him to earn the maximum interest which could be earned under the farmout agreement. The evidence shows that he spent between $13,000,000 and $14,000,000 of drilling costs attributable to the Martin acreage for the Long Butte Unit 30–1 well, the substitute Long Butte Unit 30–1X well, the Long Butte Unit 2 and the Flatt 28–1 and the Lysite 9–1.

In determining whether the Long Butte Unit 2, the Flatt 28–1 and the Lysite 9–1 had to be commenced within 180 days of completion of the Unit well, the trial court gave effect to all the provisions of the contract including those contained in the amendatory letter of March 25, 1977. The letter of March 25, 1977 states that as the first "Test Well" does not earn Moncrief the full interest, the drilling of "subsequent tests" can earn the interest agreed to.

The Long Butte Unit 2 well was a well to be drilled subsequent to the unit well but was commenced prior to the Long Butte Unit 30–1 well because Monsanto had a rig available before a rig was available for the Test Well. Because of the shortage of drilling rigs Moncrief was unable to drill multiple deep wells simultaneously. Moreover he sought to obtain subsurface geological information from one well before he selected a location of and drilled the next one. The record supports the finding that Moncrief would not have entered into an agreement under which he would be required to drill an indeterminate number of wildcat wells simultaneously running the risk of multiple dry holes, particularly in view of the fact that only one dry hole drilled on a Martin lease would earn him the maximum interest which could be earned.

The trial court concluded that there existed no possibility that a well such as the Long Butte Unit 30–1 could be drilled to a total depth, equipped and completed ready to produce, and a participating area be proposed and approved by the U.S.G.S., all within 180 days so as to permit additional wells to be commenced within this period. The court found that Moncrief would not have entered into an agreement that would have required him to do this absolutely at the risk of default.

■ Martin maintains the interpretation of the contract to be a question of law while Moncrief contends that it is a question of fact which has been determined by the trial court. The truth is that in Wyoming it is a mixed question. *Amoco Production Co. v. Stauffer Chemical Co. of Wyoming*, 612 P.2d 463 (Wyo.1980); *Shepard v. Top Hat Land & Cattle Co.*, 560 P.2d 730 (Wyo.1977); *Worland School Dist. v. Bouman*, 445 P.2d 364 (Wyo.1968); *Goodman v. Kelly*, 390 P.2d 244 (Wyo.1964).

■ We conclude, as did the trial court, that the literal construction of the ambiguity regarding the commencement within 180 days of completion of the unit well is unrealistic and unreasonable.

The trial court called attention to the letter of March 25th which states that if the first "Test Well" does not earn Moncrief a full interest, drilling subsequent tests can earn the interest agreed to. Three such subsequent tests were drilled, if not by Moncrief personally, by his agents and these were sufficient to earn Moncrief the full interest. These are covered by the letter and are "subsequent tests" within the provisions of that paragraph in the letter.

■ We have frequently held that where an agreement can fairly be said to have two constructions, that which is fair or rational and of a character that prudent men would naturally enter into is to be preferred to a construction that is inequitable or unusual or such that reasonable men would not likely enter into it. *See Roosevelt Materials Co. v. Nolan Brothers, Inc.*, 264 F.2d 807 (10th Cir. 1959); *Liberty National Bank and Trust Co. v. Bank of America National Trust and Savings Association*, 218 F.2d 831, 840 (10th Cir. 1955); *Miller v. Miller*, 134 F.2d 583, 589 (10th Cir. 1943), *cert. denied*, 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 441; *Phillips Petroleum v. Gable*, 128 F.2d 943, 944–945 (10th Cir. 1942); *Champlin v. C. I. R.*, 71 F.2d 23, 28 (10th Cir. 1934); *Ramsey v. Deepwater Oil Refinery, Inc.*, 65 F.2d 931, 933 (10th Cir. 1933).

Martin maintains that the question of locating the wells on Martin acreage is also a question of law. It too is a mixed question under the present circumstances, but as far as its character is as a question of law, it can be said that the only mention of location in either the farmout agreement or the letter pertains to the one test well. The subsequent tests are something other than the principal well which is supposed to disclose the information, which was the object of the enterprise. The letter said that if the first test well did not earn Moncrief his full interest under the agreement, that the drilling of subsequent tests can earn the interest agreed to. Three test wells, which we now are considering, that is the Long Butte Unit No. 2, Flatt 28–1 and Lysite 9–1, although they are off Martin acreage, are within the unit area.

The letter referred to the drilling of "subsequent tests". There was nothing to tie this to the test well whereby one can effectively argue that all the requirements applicable to the test well applied to the "subsequent tests" as well. Furthermore the clause said that if "our acreage on the first test well does not earn your company its full interest under the agreement, that the drilling of subsequent tests can earn the interest agreed to." Obviously the test well was to be on Martin's acreage but there is no requirement that the subsequent tests be on that acreage. It could very easily have been stressed if that had been the intention, but the lack of positive words in this clause left it open to the trial judge to decide that no provision had been made for the proposition now argued. Thus, it would be impossible to hold this finding and conclusion to be plain error. We must hold that it was open to the trial court to decide the question the way it did.

Our conclusion is that the trial court's analysis was generally sound. No other conclusions have been reached under the facts presented. *Palmer v. Howard*, 493 F.2d 830 (10th Cir. 1974); *United States v. Continental Oil Co.*, 364 F.2d 516 (10th Cir. 1966).

The judgment is affirmed. The trial court's ruling as to the payout provisions are also affirmed.