NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| RED HOOK CONSTRUCTION, LLC, ) | |
| ) | Supreme Court No. S-18031 |
| Appellant, ) | |
| ) | Superior Court No. 3KO-18-00306 CI |
| v. ) | |
| ) | MEMORANDUM OPINION |
| RANDALL C. BISHOP, TERESA C. ) | AND JUDGMENT[*] |
| BISHOP, and RICHARD PUTNAM, ) | |
| ) | No. 1925 – October 19, 2022 |
| Appellees. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kodiak, Stephen B. Wallace, Judge.

Appearances: Peter A. Scully, Schwabe, Williamson & Wyatt, P.C., Anchorage, for Appellant. Jill C. Wittenbrader, Law Office of Jill Wittenbrader, LLC, Kodiak, for Appellees.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

# I. INTRODUCTION

A property owner contracted with an excavation contractor to build a retaining wall as part of a duplex project. The excavation contractor worked on the project in phases, billing the owner after completing a phase despite the contract stating payment was due on completion. After the owner failed to pay an invoice, the contractor abandoned the project and recorded a construction lien on the property. Eventually, the

---

[*]     Entered under Alaska Appellate Rule 214.

contractor sued the owner for the contract price, alleging breach of contract. The owner counterclaimed for breach of the payment terms and the warranty of workmanlike construction, seeking damages. The superior court determined that the contractor billed the owner in violation of the contract and breached express and implied warranties of workmanlike construction, and awarded damages in favor of the property owner.

Though we agree that the contractor breached the payment-on-completion term of the contract, we reverse the related damages award because the owner failed to prove the breach caused his claimed damages. We also reverse the superior court's decision that the contractor breached the warranties of workmanlike construction.

## II.    FACTS AND PROCEEDINGS

Randy Bishop is a self-employed businessman who co-owns a lot on Spruce Cape Road in Kodiak. Dayton Wandersee is the owner-operator of Red Hook Construction, LLC (Red Hook),[1] an excavation and construction company also based in Kodiak.

In 2016 Randy Bishop (Bishop) and his mother decided to build a duplex on the Spruce Cape Road property. Bishop took charge of the project, intending the duplex to serve as his family's first home and as a long-term business investment. Serving as the project's general contractor, Bishop solicited and accepted bids from subcontractors. He also obtained a construction loan to finance the project.

### A.    Bishop Contracted With Red Hook To Work On The Duplex Property.

Bishop required a contractor to prepare the duplex's site pad by setting the foundation and building a retaining wall. During the start-up phase for the project, Bishop and Red Hook met several times to gauge Red Hook's ability to perform the

---

[1]    We refer to Red Hook in the context of the arguments made at trial and on appeal. But when we discuss testimony at trial, we refer to Wandersee by name.

excavation work needed.  At the meetings and in subsequent text messages, Red Hook and Bishop discussed potential project details, such as raising the site pad by two feet. After discussing these details, Bishop asked Red Hook to prepare a project "estimate."

In July 2016 Red Hook sent Bishop a "proposal," containing an estimate and other terms.  The proposal specified work that included "[p]repping site for duplex" and building a "4-foot high rock retaining wall" on the property.   The contract guaranteed that "all work [would] be completed in a workmanlike manner according to standard practices."  Red Hook set the price for work at a "lump sum" total of $34,550. By signing the proposal, Bishop could accept its terms, authorizing Red Hook to begin the "work as specified."  Rather than return the signed proposal to Red Hook, Bishop accepted the proposal over the phone.  Red Hook started construction a few days later.

Red Hook organized its construction into three phases, intending to invoice Bishop upon completion of each phase.  "Phase 1" involved preparing the site pad to pour the foundation.  According to Bishop's trial testimony, "Phase 1" proceeded smoothly.  At the end of July 2016, Bishop received an invoice of $23,186.15, reflecting Red Hook's time, materials, and labor by its hourly rate for that phase.  After waiting almost six months for payment, Red Hook recorded a construction lien on the property in December 2016.  A day later, Bishop made a partial cash payment, and he did not pay the remainder until May 2017.  Bishop testified that he was unaware of the lien when he made the partial payment.

Red Hook returned to the project to build the retaining wall for "Phase 2," notwithstanding apparent reservations about Bishop's ability to timely pay the invoices. To construct the retaining wall, Red Hook first needed to set the footers for the wall to sit on. Red Hook arranged forms to create stepped-down footers based on "the contours of the rock that [lay] there."  This stepped-down design resulted in the retaining wall measuring four feet in the front part of the property but six feet in the back part of the

property. After laying the footers, Red Hook used concrete blocks to build the retaining wall. Red Hook then placed compacted rock between the retaining wall and the house structure. "Phase 2" ended in October 2017.

Red Hook did not bill Bishop for "Phase 2" until two months later. Bishop testified that after receiving the invoice, he was "shock[ed]" because the total, $22,319.99, added to the first invoice, exceeded the contract price. He called Red Hook in "late January" to discuss making a partial $15,000 payment, which he alleged Red Hook "okayed." When cross-examined on this subject at trial, Wandersee denied having this conversation, claiming he had stopped taking Bishop's calls due to the unpaid invoice. At other points, however, he testified and presented evidence indicating that Bishop made a $15,000 partial payment towards the "Phase 2" invoice.

Bishop's failure to pay the invoice in full prompted Red Hook to abandon "Phase 2" of the project and record a second construction lien. As a result, Bishop testified that he hired a second contractor to complete the backfilling around the retaining wall necessary to complete "Phase 3" construction.

**B.      Red Hook Sued Bishop For Breach Of Contract And Bishop Counterclaimed For The Same.**

In September 2018 Red Hook sued Bishop for the remaining balance of the "Phase 2" invoice ($7,319.99).[2] Bishop counterclaimed that Red Hook breached the

---

[2]      Red Hook also brought a third-party complaint, in response to the Bishop's counterclaim. The third-party complaint alleged Richard Putnam, Bishop's friend and a subcontractor, actually served as general contractor on the project, making him liable to Red Hook and Bishop. The court, however, found that Bishop was general contractor and dismissed the claims brought by Red Hook against Putnam, which Red Hook does not appeal.

contract by billing him in violation of the contract terms and recording construction liens when he did not pay, and by constructing the retaining wall in an unworkmanlike manner. A bench trial took place over four days in August and September 2020.

**1.     The contract's payment terms.**

Wandersee testified that he understood Bishop agreed to a time and materials contract, which entailed periodic billing for labor, equipment and materials used on the project. He stated that this kind of project had "too many variables" to proceed on a fixed-price basis. Wandersee did not object when counsel stated that the proposal "looks . . . like a fixed-price offer," but he reiterated that he never did this kind of build on a fixed-price basis.

Bishop countered that he had accepted the written proposal over the telephone, meaning payment was due on completion. He said that he kept a signed copy of the proposal in his personal records after this verbal acceptance. Bishop added that he paid the invoices because he misunderstood "as a newbie" that he did not need to pay "as the work [went] on" and could wait to "pay when the work was totally complete." In his counterclaim, Bishop alleged the time and materials billing "caused [him] to be unable to secure a long-term mortgage on the property," forcing him to "continue [the] construction loan on the property." He testified that the second construction lien delayed his ability to "get out of [the] construction loan . . . [with its] higher interest rate, [and] higher monthly payment."

**2.     Breach of the warranty of workmanlike construction.**

Both parties testified and presented evidence about the wall's construction and the lack of timely engineering approval for the wall's design. The court also visited the site to assess the wall's design and construction.

Bishop first contended that Red Hook failed to inform him that the retaining wall required engineering approval. Bishop called the borough inspector as a witness,

and the inspector testified that borough code required engineering approval for a retaining wall more than four feet high or a wall that "is four foot or less" but is "retaining a surcharge," meaning that the wall retains "the weight of something additional on top of [the] earth" already held behind the wall. Bishop's wall required a permit for both reasons. Bishop testified that he expected a four-foot-high wall as specified in the proposal and was unaware of the engineering requirement until Red Hook mentioned it after finishing construction of the wall. The city inspector also testified that after construction, he told Bishop "the retaining wall was tall enough[] that it needed to have engineer design." Though an engineer did not approve the wall's design before it was constructed, Bishop obtained an engineer's approval afterwards. After submitting the engineer's approval to the borough, Bishop received a certificate of occupancy from the borough.

Wandersee countered that because the wall was not designed to exceed four feet, it did not require engineering. He claimed that parts of the wall exceeded four feet because the Bishops wanted the wall to be level all the way across.

Bishop also argued that the retaining wall had developed a lean and that this was due to a breach of the warranty of workmanlike construction. In their testimony, neither Wandersee nor Bishop disputed the lean existed. Bishop testified that he first noticed a lean "shortly after [the wall] was done" but that he observed the lean worsening over time. When he asked another contractor about fixing the lean, that contractor estimated that it could do so at a cost of $14,000. At trial, though, that contractor backed off its estimate, calling the estimate "a guess." Wandersee hypothesized in his testimony that this second contractor may have caused the wall to lean by hitting the wall with its equipment. Both parties also submitted photographs as exhibits to show the wall's design and construction.

To supplement the evidence about the wall's construction, the trial judge

visited the property at Bishop's request. The judge traveled to the property with the parties and their counsel and then recorded findings immediately upon returning to the courtroom. The court described how "[f]rom [its] perception . . . [it] couldn't see any discernible tilt to the wall." The court examined the wall's foundation and saw the "footers" lying on top of "compacted rock above what appeared to be a substrate of solid rock." It also added that at the back of the house it "wasn't able to see [what the wall] went down to [but] that footer appeared to be on top of [compacted rock]."

**E.     The Superior Court Determined Red Hook Breached The Contract.**

The court first made findings about the formation of the contract. It next addressed the claims for breach that stemmed from the contract's billing terms, determining that Red Hook's early billing violated the parties' contract and caused Bishop damages. It then considered Bishop's claim that the wall's construction was defective and ultimately ordered Red Hook to specifically perform a modified contract and rebuild the wall.

**1.     The superior court concluded that Red Hook and Bishop agreed to a fixed-price contract.**

The court concluded that the parties formed a fixed-price contract based on its express terms and found Bishop's testimony to be "more credible" than Wandersee's on this issue. Interpreting the proposal as written, the court concluded that Red Hook promised to construct the retaining wall for a "lump sum" cost of $34,500, including all labor and materials. The court found that from negotiation of the contract through the construction phase, Bishop was inexperienced and Red Hook was the "authoritative" party. Though Bishop paid the Phase 1 invoice and part of the Phase 2 invoice, the court determined that "Bishop's acquiescence to the early billing . . . [was] a product of [his] naivete when acting as a general contractor" and not "as evidence of there being a 'time and materials' " contract.

**2. The superior court concluded that Red Hook's Phase 1 and 2 invoices and recorded liens constituted breach and caused Bishop damages.**

The court then found that Red Hook breached the contract's terms. Invoicing for Phases 1 and 2, at a total of "$45,506.14 or $11,006.14 more than the contract price" of $34,550, before the project was complete, breached the contract. When Bishop did not timely pay the invoices, Red Hook again breached the contract by recording two construction liens. Red Hook's decision not to "complete the contemplated work related to the contract which was necessary to permit the completion of the duplex" after "Phase 2" also breached the parties' contract.

The court further determined that the second lien caused Bishop damages due to the extra interest Bishop paid when the second lien delayed refinancing of the project. In particular, the court found that the recording of the second lien delayed Bishop's refinancing and caused him to continue to have to pay higher "interest fees" associated with the construction loan. To calculate the damages award, the court took notice of AS 34.35.080(a),[3] which requires a construction lienholder to pursue enforcement of the debt within six months of filing the lien or the lien is released. The court determined that Red Hook caused $13,265.73 in additional fees while the lien

---

[3]     AS 34.35.080(a) states:

(a) A lien provided for in AS 34.35.050 – 34.35.120 does not bind real property for more than six months after the claim of lien is recorded, unless an action is commenced in the proper court to enforce the lien within (1) that time; or (2) six months after recording of an extension notice in the same recording office within the original six-month period showing the recording date and the book and page or instrument number or serial number of the initial claim of lien, and the balance owing.

burdened the Spruce Cape property from March to September 2018. Red Hook disputed that this lien caused such fees because Pro-Pac, the drywall contractor, had also recorded a lien in March that lasted until September under AS 34.35.080(a). But the court rejected the argument that the Pro-Pac lien could have concurrently caused Bishop's delay in refinancing, finding that "as a matter of proof" Red Hook had not shown by a "preponderance of evidence that the Pro-Pac lien . . . impacted the accrual of interest charges."

> **3.** **The superior court concluded that Red Hook breached the warranty of workmanlike construction, resulting in damages warranting specific performance.**

The court found that Red Hook breached the warranty of workmanlike construction in two ways: by improperly setting the retaining wall's foundation and by failing to inform Bishop of the borough's engineering requirement before beginning construction. The court ordered specific performance, requiring Red Hook to rebuild the retaining wall in compliance with the borough's engineering requirement.

Based on photographs admitted at trial and the court's site view, the court concluded Red Hook did not construct the retaining wall on bedrock. The court found that the photographs submitted as exhibits "establish[ed] that the end of the form set to underlay the six foot tall portion of the wall which is also closest to the back of the lot is not set on bedrock," which was "entirely consistent with the court's view of the scene during the trial." The court reviewed the record from its site visit, finding that "it appeared reasonably apparent . . . that while the forms were set on compacted gravel on top of the bedrock, the end of the form at the end of the wall closest to the back of the lot did not appear to be set on bedrock or even securely compacted gravel." The court concluded that not setting the retaining wall's foundation on bedrock was a "deficiency in [its] construction" that "resulted in the wall starting to fail as it is beginning to sink . . .

and to lean out."

In ordering specific performance, the court stated that it was exercising its equitable discretion to give "legal effect to [Bishop's] intention" of having a "code compliant" retaining wall. The court found that damages "[were] really speculative," as the cost of "pay[ing] some other company to come in and remove and repair the wall is an open question. It could easily exceed the contract price." The court decided that rebuilding the retaining wall was the only remedy that gave Bishop the benefit of his bargain. It thus ordered Red Hook to redo construction subject to "specific limitations," requiring Red Hook to obtain engineering approval and cover the costs of the "labor, materials, and equipment necessary."

Red Hook appeals the findings of breach, the damages award, and the grant of specific performance.

## III.   STANDARDS OF REVIEW

Contract interpretation presents a question of law that we review de novo, "apply[ing] our 'independent judgment' " and "adopting the rule of law most persuasive in light of precedent, reason, and policy."[4]   When the superior court's interpretation relies on extrinsic evidence, we apply the "clearly erroneous standard" as we would to other findings of fact.[5]   A finding of fact is clearly erroneous "when 'our review of the record leaves us with the definite and firm conviction that the superior court has made a mistake.' "[6]

---

[4]      *Kimp v. Fire Lake Plaza II, LLC*, 484 P.3d 80, 86 (Alaska 2021) (quoting *Hahn v. GEICO Choice Ins.*, 420 P.3d 1160, 1166 (Alaska 2018)).

[5]      *N. Pac. Processors, Inc. v. City and Borough of Yakutat, Alaska*, 113 P.3d 575, 579 (Alaska 2005).

[6]      *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508

(continued...)

When the superior court remedies a breach of contract with damages, the "determination of damages is a finding of fact which we affirm unless it is clearly erroneous. But we apply our independent judgment in deciding whether the [superior] court's award of damages is based on an erroneous application of law."[7]

## IV. DISCUSSION

We first address both parties' claims stemming from the contract's payment terms. Because we agree with Bishop's interpretation that the parties formed a fixed-price contract, we affirm the superior court's conclusion that Red Hook's early billing and recording of construction liens breached the contract. But Bishop failed to demonstrate that the second lien was the cause of his additional interest payments, and the court therefore erred in awarding damages.

We next address the warranty of workmanlike construction, concluding that the court clearly erred in finding that Red Hook improperly constructed the retaining wall. Additionally, although we agree with the superior court that Red Hook breached its duty to inform Bishop that the wall design required engineering approval, we conclude that the court clearly erred in finding that this breach caused harm to Bishop under the circumstances.

### A. The Payment Terms.

Though we agree that Red Hook violated the fixed-price terms of the parties' contract,[8] we reverse the damages award because the court erred by shifting

---

[6] (...continued)
(Alaska 2015) (quoting *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006)).

[7] *Kimp*, 484 P.3d at 86 (alteration in original) (quoting *Beaux v. Jacob*, 30 P.3d 90, 97 (Alaska 2001)).

[8] We note that the superior court found that Red Hook's abandonment of the
(continued...)

Bishop's burden to prove causation to Red Hook.[9] Moreover, the record lacks sufficient evidence to support that the second construction lien, and not the Pro-Pac lien, caused Bishop's damages.

### 1. The parties formed and did not modify a fixed-price contract.

The terms of the parties' contract determine whether Red Hook's phased invoices or Bishop's failure to pay constituted breach. The superior court found that Bishop and Red Hook agreed to a fixed-price contract based on the contract's express payment-due-on-completion term. Red Hook does not specifically contest that the parties formed a fixed-price contract, but argues that the combination of early billing with Bishop's early payments subsequently modified the contract, excusing any breach of the contract's original terms.

The parties to a contract can modify the "written contract . . . either through subsequent conduct or oral agreements."[10] "Whether a modification has occurred is a

---

[8]  (...continued)
project also breached the contract, but the court assessed no damages for the breach, and neither party challenges this aspect of the court's decision on appeal. The court reasoned that Bishop was "not entitled to recover damages" for the abandonment because Bishop ultimately paid less than the contract price to complete the wall's construction. Bishop paid $8,212.50 to the contractor hired to complete the "Phase 3" backfilling. That amount plus the amount Bishop paid on the "Phase 1" invoice equals less than the contract price ($8,212.50 + $23,186.15 = $31,398.65, which is less than $34,500). While Bishop may have made a partial payment on the "Phase 2" invoice, the court expected that payment would be returned pending its order.

[9]  *See Kimp*, 484 P.3d at 86 (reviewing damages awards de novo to decide if award is based on legal error).

[10]  *Alaska Statebank v. Fairco*, 674 P.2d 288, 292 (Alaska 1983); *Baker v. Ryan Air, Inc.*, 345 P.3d 101, 110 (Alaska 2015) ("[A] party may demonstrate a contract modification through evidence of an oral agreement along with evidence of the parties'
(continued...)

question of fact."[11]

The court's finding that the parties did not modify the payment terms of the contract was not clearly erroneous. When counsel characterized the "proposal" sent to Bishop as "a fixed-priced offer," Wandersee did not object, nor did he explain why he used that form of proposal for what he described as a time and materials project. The superior court credited Bishop's testimony that he did not share Wandersee's suggested understanding that Red Hook's proposal constituted a time and materials contract. The court ultimately determined that "Bishop[] acquiesce[d] to the early billing" despite the proposal's plain language because he was the less sophisticated party and deferred to Red Hook's expertise. Given the testimony and other evidence in the record, the court did not clearly err by finding that the parties formed a fixed-price contract, that the parties never agreed to modify the contract, and that Red Hook breached the contract when it billed Bishop as if he had agreed to time and materials terms.[12]

**2.      Red Hook breached the contract, but the court erred by finding that the breach caused damages.**

The superior court properly found that Red Hook breached the fixed-price contract by billing Bishop in phases and recording the two construction liens to induce early payment. Adding the Phase 1 and 2 invoices together, Red Hook billed Bishop "$45,506.14[,] or $11,006.14 more than the contract price of" $34,550 before completing the contract's "specified work." Consequently, the court properly determined that Red Hook, not Bishop, breached the contract.

---

**10**      (...continued) subsequent conduct.").

**11**      *Alaska Statebank*, 674 P.2d at 292.

**12**      *Cf. Gilbert v. Sexton*, 401 P.2d 300, 301-02 (Alaska 1965) (determining evidence supported finding that parties' conduct modified contract term).

The party alleging breach of contract has the burden to show the "nexus between the wrongful conduct of the [breaching party]" and the injury asserted.[13]  To satisfy the "burden of proof . . . required to show that [the plaintiff] suffered damages," the plaintiff must prove by "a preponderance of the evidence that it was harmed."[14] Though Red Hook breached the contract, Bishop did not demonstrate how the breach injured him.  The court accepted Bishop's account at trial that the second construction lien recorded by Red Hook delayed his refinancing for the project and caused him to pay extra interest payments.  But it was error to reject Red Hook's argument that a separate lien may have caused the delay in refinancing and that Bishop therefore had not sufficiently proven causation of his damages.[15]

Red Hook raised the concurrent Pro-Pac lien to support the idea that its own second lien "was not an actual or proximate cause" of Bishop's delay in refinancing his high-interest loan into a lower-interest mortgage.  The superior court found, however, that Red Hook "as a matter of proof [had] not established a preponderance of evidence that the Pro-Pac Lien . . . impacted . . . [the] interest charges."  But it was not Red Hook's burden to prove that another lien, and not its own, caused Bishop's claimed damages;

---

[13]     *See City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 224 (Alaska 1978) (citing *Dowling Supply & Equip, Inc. v. City of Anchorage*, 490 P.2d 907, 909 (Alaska 1971)), *disapproved on other grounds by Native Alaskan Reclamation & Pest Control, Inc. v. United Bank Alaska*, 685 P.2d 1211, 1219 (Alaska 1984).

[14]     *Recreational Data Servs., Inc. v. Trimble Navigation Ltd.*, 404 P.3d 120, 136-37 (Alaska 2017); *see also Fernandes v. Portwine*, 56 P.3d 1, 5 (Alaska 2002) ("Preponderance of the evidence is the general burden of persuasion in civil cases.").

[15]     *Cf. In re Est. of Rodman*, 498 P.3d 1054, 1073 (Alaska 2021) (holding that superior court "commits legal error if it 'fail[s] to make factual findings appropriate to the relevant legal test' " (alteration in original) (quoting *Anchorage Chrysler Ctr., Inc. v. Daimler Chrysler Corp.*, 129 P.3d 905, 916 (Alaska 2006))).

rather, it was Bishop's burden to establish that Red Hook's lien caused him damages.[16] It was thus error to "improperly shift[] the burden" to Red Hook to disestablish causation of damages.[17]

Furthermore, our review of the record persuades us that Bishop did not meet his burden of proof. Red Hook provided evidence that Pro-Pac recorded its lien in March, and demonstrated that pursuant to AS 34.35.080(a), the Pro-Pac lien would have encumbered the property for six months until September 2018. The record contains no evidence of any release of the lien. Indeed, Bishop's own testimony confirmed that the Pro-Pac lien in fact existed, that Bishop did not do anything to get Pro-Pac's lien released, that he spoke with the "son of the owner of [Pro-Pac]," and that at some point "the lien was gone." This testimony does not establish that the Pro-Pac lien was released during the pendency of Red Hook's lien, or that it was Red Hook's lien as opposed to Pro-Pac's lien that delayed Bishop's ability to refinance the project.[18] We therefore reverse the award of damages to Bishop for the interest payments he made between March and September 2018.[19]

---

[16] *See Glamann v. Kirk*, 29 P.3d 255, 262 (Alaska 2001) (arguing "defense to allegations of liability" does not shift burden of proof and plaintiff still has "burden to prove that [defendant] caused his claimed injuries"); *cf. Morrow v. New Moon Homes, Inc.*, 548 P.2d 279, 294 (Alaska 1976) ("The party raising the affirmative defense generally bears the burden of proof as to that issue.").

[17] *Glamann*, 29 P.3d at 262.

[18] *See City of Whittier*, 577 P.2d at 224 (rejecting testimony meant to establish causation of damages that was "pure speculation").

[19] In addition to the court's improper shifting of the burden to Red Hook on the question of causation of harm, and Bishop's failure to prove that Red Hook's lien caused any harm, it was error to fail to account for interest that Bishop would have to pay even had he successfully refinanced the project. For breach of contract claims the

(continued...)

**B.    The Warranty of Workmanlike Construction.**

Bishop's other claim of breach invoked the warranty of workmanlike construction.  Before the superior court, Bishop contended that Red Hook violated two aspects of the warranty:  the duty to construct a functioning retaining wall and the duty to inform him that the wall required pre-construction engineering approval.  The superior court found that Red Hook violated both aspects of the warranty.  Given the record, including the superior court's own findings following its site visit, we reverse as clearly erroneous the superior court's findings that Red Hook constructed the wall's foundation in an unworkmanlike manner.[20]  We also conclude that while Red Hook violated its duty to inform Bishop of the borough engineering requirement, the violation did not cause

---

[19]    (...continued)
"ordinary measure of damages . . . is the expectation interest," *Alaska Constr. Equip., Inc. v. Star Trucking Inc.*, 128 P.3d 164, 167 (Alaska 2006), which is intended to "put the injured party in as good a position as that party would have been had the contract been fully performed." *Murray E. Gildersleeve Logging Co. v. N. Timber Corp.*, 670 P.2d 372, 377 (Alaska 1983) (quoting *Guard v. P&R Enters.*, 631 P.2d 1068, 1071 (Alaska 1981)).  Here the court awarded damages to cover the full interest payments Bishop made on his construction loan while the second construction lien encumbered the property.  Bishop, however, admitted at trial that he would have had to pay "some interest" on a refinanced loan but called the amount of interest an "unknown variable" because the lien prevented his refinancing.  Red Hook correctly argues that Bishop's expectation interest only entitled him to interest paid under the construction loan minus the interest Bishop would have paid under a refinanced loan.  It was therefore error to award Bishop damages exceeding his "actual loss." *See Murray E. Gildersleeve Logging Co.*, 670 P.2d at 378; *see also DeNardo v. GCI Commc'n Corp.*, 983 P.2d 1288, 1290-92 (Alaska 1999) (holding injured party could not claim damages for total loss of a prize that he only had a chance to win under breached contract).  Bishop could have supplied an evidentiary basis for calculating his expectation interest, such as the historical interest rates for a refinanced loan; but he only submitted an exhibit showing the interest he paid when refinancing was delayed.

[20]    *See Lewis v. Anchorage Asphalt Paving Co. (Lewis I)*, 535 P.2d 1188, 1190-1200 (Alaska 1975).

-16-                                          *1925*

Bishop any harm.[21]

### 1. The court's finding that Red Hook constructed the wall in an unworkmanlike manner was clearly erroneous.

Construction contracts may contain an express and implied warranty of workmanlike construction.[22] A contract term defines the express warranty.[23] A contractor who "holds himself [or herself] out to be specially qualified to do a particular type of work" also creates an implied warranty "that the resulting building, product, etc. will be reasonably fit for its intended use," which is "virtually coextensive" with an express warranty term providing that the work will be completed in a workmanlike manner.[24] "The scope of [both] warranties . . . is directly related to the scope of the duties and obligations imposed on the parties by their contract."[25] While the specific scope of an express warranty varies with the contract's terms, "the ultimate objective [of] . . . the warranty of workmanlike construction is the construction of a [building] of good quality."[26]

The superior court determined that Red Hook constructed the wall in a

---

[21]     *See Lewis v. Anchorage Asphalt Paving Co. (Lewis II)*, 579 P.2d 532, 534-35 (Alaska 1978) (violating the duty to inform renders a contractor "liable . . . for those damages necessary to put [the project owner] in as good a position as that in which he would have been had such a warning been given").

[22]     *Lewis I*, 535 P.2d at 1195-96.

[23]     *See id.* at 1192 (quoting contract's express warranty: "All material is guaranteed to be as specified. All work is to be completed in a workmanlike manner according to standard practices.").

[24]     *Id.* at 1196.

[25]     *Id.*

[26]     *Moglia v. McNeil Co.*, 700 N.W.2d 608, 614 (Neb. 2005).

unworkmanlike manner by not fully setting the foundation on bedrock. In making this finding, the court relied on its site visit and photographs that Bishop had submitted as evidence. But the court's description of its site visit on the record, the photographs, and other trial testimony are inconsistent with the court's ultimate finding that the construction of the wall was deficient.[27]

Trial testimony suggested that Red Hook built the wall in accord with best industry practices. Wandersee testified that he designed the stepped down foundation to set the footers as "close as [he could] to solid rock." He added leveling rock where necessary due to the stepped down foundation design, which he affirmed was "consistent with best industry practices." The borough inspector testified that he also thought the foundation was built on solid bedrock, but that he could not be sure because he did not do an inspection before construction began. Putnam stated that he did not know what material Red Hook laid the foundation on.

The court's ultimate finding of a deficiency in the wall's construction does not align with what the court described on the record after its site visit. Immediately after the site visit, the court noted that the footers were on top of compacted rock, and specifically described the portion of "the concrete footer . . . closest to the back of the house" as "appear[ing] to be on top of D1 [rock]," a type of crushed or compacted rock.[28] In its post-trial factual findings, the court considered the photographs of the construction site in addition to its site view findings, stating that the photos were "entirely consistent with the court's [site] view," and that "the ground beneath the wall may at some points

_____

[27]     *Cf. Hurd v. Henley*, 478 P.3d 208, 214 (Alaska 2020) ("Because testimony and photographs admitted into evidence supported the superior court's determination . . . that factual finding was not clearly erroneous.").

[28]     Richard Putnam described D1 as "small gritty gravel."

be in contact with bedrock." The court then contradicted its earlier site visit findings, noting that "the end of the [footer] closest to the back of the lot did not appear to be set on bedrock or even securely compacted gravel."

Altogether it is clear that the evidence and testimony regarding the wall's construction more closely align with Wandersee's testimony that he built the wall as close to bedrock as possible, using leveling rock only where necessary, and does not support the court's finding that the wall was built in a deficient manner.[29] No other witness testified that best construction practices required the wall to be built directly on bedrock. And no other witness contradicted Wandersee's testimony that Red Hook adhered to the standard representing best industry practices. The court's contemporaneous findings show that the wall was built on bedrock or compacted leveling rock where necessary and the court found that the photographs are, for the most part, "entirely consistent with the court's [site] view." We accordingly are left with a definite and firm conviction that a mistake has been made,[30] and hold that the court clearly erred.

**2. Though Red Hook failed to inform Bishop of the engineering requirement, the court clearly erred in finding that the failure caused harm.**

The implied and express warranties of workmanlike construction contain an additional duty requiring the contractor to inform the other party "regardless of [the contractor's] personal expertise, of potential defects in [the] project which come to the

---

[29] *See Kazan v. Dough Boys, Inc.*, 201 P.3d 508, 513 (Alaska 2009) ("We review factual findings under the clearly erroneous standard and in the light most favorable to . . . the prevailing party below." (footnote omitted)).

[30] *Id.*

contractor's knowledge or should come to [the contractor's] knowledge."[31]  This duty

to inform "is an essential element of performing any contract in a workmanlike manner

according to acceptable standards."[32]  The elements of a claim for breach of the warranty

include proving a breach of the duty to inform and a causal connection between the

breach and injury suffered.[33]

    The superior court did not err by concluding that Red Hook should have

informed Bishop that the wall's design required engineering approval before

constructing the wall.  Ample testimony demonstrates Red Hook should have known that

the borough required pre-construction approval for the retaining wall.  According to the

borough inspector, the fact that the wall retained a surcharge and that a portion of the

wall was taller than four feet subjected it to the engineering requirement; Wandersee also

testified he was aware that a wall height greater than four feet would require engineering

approval.  We agree with the superior court's conclusion that Red Hook breached its

duty to disclose the engineering requirement.[34]

    But it was error to find that the failure to inform actually caused Bishop

---

  [31] *Lewis I*, 535 P.2d 1188, 1197-99 (Alaska 1975) (citing *Morrison-Knudsen Co. v. State*, 519 P.2d 834, 842 (Alaska 1974) (discussing a public contract with state)).

  [32] *Id*.

  [33] *Id.* at 1200; *Lewis II*, 579 P.2d 532, 533 (Alaska 1978); *see also Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 253 (Utah 2009) (establishing the elements of showing a breach of the implied warranty of workmanlike manner under Utah law); *Lyons v. Midnight Sun Transp. Servs., Inc.*, 928 P.2d 1202, 1204 (Alaska 1996).

  [34] *Lewis II*, 579 P.2d at 534-35.

harm.[35]  We held in *Lewis v. Anchorage Asphalt Paving Co.* that the breach of the warranty of workmanlike construction must cause harm to warrant judicial relief.[36] *Lewis* involved a dispute between a trailer court owner and an asphalt company.[37]  Prior to contracting with the asphalt company, the owner had spread fill material, composed primarily of "glacial till," on top of the existing "peat base" to create "a stable surface acceptable for trailer sites."[38]  Unbeknownst to the owner, this mix of subsurface conditions was "frost susceptible," and when the contractor paved directly on top of the fill, the streets quickly deteriorated.[39]  We determined that "[t]he evidence was undisputed" that the contractor's paving method caused the "precise type of failure of the [streets] . . . here."[40]  We held that the contractor had a duty to warn the owner and owes damages for such a failure to warn," "[i]f [the contractor] knew or reasonably should have known of the [frost-susceptible] subsurface conditions" that caused the streets to fail.[41]  But we also clarified that a contractor does not have a duty to "warn of

---

[35]     *Native Alaskan Reclamation & Pest Control, Inc. v. United Bank of Alaska*, 685 P.2d 1211, 1216 (Alaska 1984) ("We, therefore, conclude that [the cross-appellant] has failed to demonstrate that the trial court's findings on this issue were clearly erroneous and affirm the trial court's findings with regard to causation.").

[36]     *Lewis I*, 535 P.2d at 1199-1200; *see also Lewis II*, 579 P.2d at 535.

[37]     535 P.2d at 1190-92.

[38]     *Id.* at 1190.

[39]     *Id.* at 1199-1200.

[40]     *Id.* at 1200.

[41]     *Id.*  In a subsequent appeal, we ultimately affirmed the trial court's finding that the contractor "knew or reasonably should have known of the subsurface conditions" and was therefore "liable . . . for . . . damages necessary to put [the owner] in as good a

(continued...)

defects . . . unless the defects are such as would likely cause the []contractor's work to fail."[42]

Red Hook's failure to inform Bishop that the wall required pre-construction engineering did not cause any similar failure. Red Hook did not disclose that the wall design required engineering, but Bishop did not suffer any related consequences. According to the borough inspector, he approved the code-required "Certificate of Occupancy" for the duplex after reviewing Bishop's post-construction engineering approval. Bishop also conceded at oral argument to us that the post-construction engineering approval was adequate and did not identify any required post-construction alterations.

There was no evidence in the record tying the wall's apparent lean, or any other claimed defect, to Red Hook's failure to inform Bishop of the engineering approval requirement. At no point did Bishop demonstrate any harm stemming from Red Hook's failure to inform. Unlike in *Lewis* where "undisputed" evidence showed that the physical defects stemmed from the contractor's failure to warn,[43] Bishop presented no evidence that the lack of pre-construction approval somehow caused the wall's lean or any other difficulty with the wall. In fact, he argued on appeal that the wall's lean was unrelated to this finding of breach. Given that Red Hook's breach of the duty to inform did not cause any harm, we reverse the court's grant of relief to Bishop.[44]

---

[41]     (...continued)
position as . . . he would have been had such a warning been given." *Lewis II*, 579 P.2d at 535.

[42]     *Lewis I*, 535 P.2d at 1199.

[43]     *Id.* at 1200.

[44]     Because we find the failure to inform did not cause any remediable harm,
(continued...)

## V.   CONCLUSION

We AFFIRM the superior court's determination that Red Hook violated the fixed-price contract requiring payment due on completion, but we REVERSE the court's associated damages award given Bishop's failure to prove causation of harm.

We also REVERSE the superior court's finding that Red Hook breached the warranty of workmanlike construction in setting the retaining wall's foundation. While we agree that Red Hook had a duty to inform Bishop that the wall required engineering approval under Kodiak Borough Code, Red Hook's failure to inform Bishop did not cause any remediable harm and we therefore REVERSE the court's grant of relief.

---

[44]     (...continued)

it is not necessary to address whether the court also abused its discretion in granting specific performance. *See Hall v. Add-Ventures, Ltd.*, 695 P.2d 1081, 1087 (Alaska 1985). Obtaining an equitable remedy such as specific performance requires the plaintiff to demonstrate he or she lacks an adequate remedy at law. *Haines v. Comfort Keepers*, *Inc.*, 393 P.3d 422, 428 (Alaska 2017). It appears here that the court found that damages were "inadequate" because Bishop did not demonstrate the cost to reconstruct the wall. But a party's failure to introduce sufficient evidence to prove damages does not mean that the party can claim that damages are an inadequate remedy at law. *See id.*